(C. D. 1141)

KARAVAN TRADING CO. *v.* UNITED STATES

United States Customs Court, First Division

(Decided December 8, 1948)

*Barnes, Richardson & Colburn (Joseph Schwartz* of counsel) for the plaintiff.
*Charles J. Miville,* Acting Head, Customs Division (*Richard E. FitzGibbon,* special attorney), for the defendant.

Before OLIVER, COLE, and MOLLISON, Judges

COLE, Judge: Counsel for defendant, in their brief, state that "In this case the only question raised by the United States, defendant, is the timeliness of the protest filed by the plaintiff herein, who is not the importer of the merchandise, but the transferee of some of the imported goods." The quoted statement has the effect of conceding the correctness of plaintiff's claim for classification of the Sumakh rugs in question under paragraph 1116 (a) of the Tariff Act of 1930 (19 U. S. C. § 1001, par. 1116 (a)), as modified by the trade agreement with Iran, 79 Treas. Dec. 234, T. D. 51067, which provides for "Oriental,

Axminster, Savonnerie, Aubusson, and other carpets, rugs, and mats, not made on a power-driven loom, plain or figured, whether woven as separate carpets, rugs, or mats, or in rolls of any width _____ 25¢ per square foot, but not less than 22½% ad valorem." The merchandise was classified by the collector under the provision for "All other floor coverings, including mats and druggets, wholly or in chief value of wool, not specially provided for * * * valued at more than 40 cents per square foot," in paragraph 1117 (c) of the Tariff Act of 1930 (19 U. S. C. § 1001, par. 1117 (c)), with duty assessment at 60 per centum ad valorem.

Defendant's motion for dismissal on the ground of untimeliness is based on facts that are undisputed. The merchandise was entered for warehouse on December 8, 1944, by the original importer, Amtorg Trading Co. During January and February 1945, the three bales (Nos. 261, 262, and 282) in question were transferred, in accordance with section 557 of the Tariff Act of 1930, as amended by the Customs Administrative Act of 1938 (19 U. S. C. § 1557), to plaintiff who made withdrawal upon payment of estimated duties at the rate of 22½ per centum ad valorem under paragraph 1116 (a), as modified, *supra*. Later, and in August 1945, the entry was liquidated and duty assessed at 60 per centum ad valorem under paragraph 1117 (c), *supra*, but in posting notice of such liquidation, the customs officials showed only the name of the importer, Amtorg Trading Co., without making any reference to the transferee, plaintiff herein. On January 21, 1946, the collector made demand on plaintiff, as transferee, for increased duties, which were paid on February 26, 1946, the amount being the difference between estimated duties based on the rate of 22½ per centum ad valorem under said paragraph 1116 (a), as modified, and the assessment of 60 per centum ad valorem under paragraph 1117 (c), *supra*, applied by the collector.

Defendant argues that the time for filing valid protest began on the date of liquidation, August 29, 1945, and that, therefore, the protest under consideration, filed March 4, 1946, is untimely under the provisions of section 514 of the Tariff Act of 1930 (19 U. S. C. § 1514), which requires that a protest shall be filed "within sixty days after, but not before such liquidation." Plaintiff, on the other hand, contends that its time to file protest did not begin to run until January 21, 1946, when "the first actual notice [was] received by the plaintiff that the Collector was demanding more than 22½ per cent duty."

Defendant cites *Hiram Walker & Sons, Inc.* v. *United States*, 25 C. C. P. A. (Customs) 189, T. D. 49293, to support its position. That case related to six barrels of rye whisky found by the Government gauger to aggregate 1,473.66 gallons, the amount upon which valid liquidation was based. Two years later, and after importer

had had the whisky regauged and found there had been an evaporation in warehouse of 105.16 gallons from the time of entry, the merchandise was withdrawn for consumption and duty assessed on the basis of the original gauge. Within 60 days after such payment (not 60 days after liquidation), the importer filed a protest. The Court of Customs and Patent Appeals sustained the Government's motion for dismissal on the ground of untimeliness, holding that there had been only one liquidation and that if the payment of duty on evaporated whisky was deemed a demand by the collector "such a demand is not an exaction or other decision which entitled the party withdrawing the goods to file a protest under any provision of the tariff act after the expiration of sixty days from the only liquidation made by the collector."

The circumstances and conditions that prevailed in the *Hiram Walker* case, *supra*, are materially different from those upon which the action before us is based. Hence, the cited case has no application to the present issue. Here, the right of plaintiff, as transferee, to file a protest is embodied in section 557, as amended, *supra*, paragraph (b) of which provides that "So long as any such transfer remains unrevoked the transferee shall have, with respect to the merchandise the subject of the transfer, all rights to file protests, and to the privileges provided for in this section and in sections 562 and 563 of this Act which would otherwise be possessed by the transferor." Referring to the effect of said paragraph (b), *Eurasia Import Co., Inc.* v. *United States*, 31 C. C. P. A. 202, C. A. D. 273, stated that "in clothing the transferee with the right of protest the statute obviously took that right away from the original importer so long as the transfer remained unrevoked * * *."

*V. P. Roberts & Co.* v. *United States*, 16 Cust. Ct. 78, C. D. 988, affirmed in *United States* v. *V. P. Roberts & Co.*, 34 C. C. P. A. 135, C. A. D. 356, is controlling. There, as here, bulletin notice of liquidation was posted in the name of the original importer, after the transferred merchandise had been withdrawn for consumption by, and when duty liability had become fixed in, the transferee. In determining the status of the transferee, the Court of Customs and Patent Appeals quoted with approval from our decision, C. D. 988, *supra*, stating that "when an irrevocable transfer like the one under consideration has been consummated, the transferee assumes the same position as that held by the original importer, subject to the same liabilities and entitled to equal statutory rights and privileges." The appellate court thereupon held, C. A. D. 356, *supra*, that the notice of liquidation to the original importer "was not a notice to appellee [transferee], and, in our opinion, appellee [transferee] was not bound to file protest within 60 days after its posting, in order to

protect its rights," and concluded that the transferee's time for filing protest did not begin to run until the extent of its liability had been determined or at least expressed.

Following the cited cases, we hold that the protest before us, having been filed within 60 days after plaintiff's duty liability was determined or expressed, is timely. The motion to dismiss is therefore denied.

The suggestion in defendant's brief, that "the transferee cannot receive greater privileges than the transferor," was also one of the contentions raised in the *Roberts & Co.* cases, *supra*, wherein it was answered in this way:

In reaching this conclusion, we do not grant any extension of right to plaintiff beyond that given to the original importer. On the contrary, we maintain, in line with the *Eurasia Import Co., Inc.*, case, *supra*, for plaintiff, as transferee, the same statutory privileges and considerations allowed an importer of merchandise. Section 557, as amended, *supra*, broadens the scope of section 514, *supra*, by adding as a party authorized to file protests the transferee of merchandise acquired pursuant to the provisions of said section 557.

Despite the fact that defendant concedes in its brief, as hereinabove set forth, that the only question it raises is the technical one concerning timeliness of the protest, plaintiff has established by uncontradicted testimony that the Sumakh rugs imported in bales 261, 262, and 282, are properly classifiable under paragraph 1116 (a), as modified, *supra*, and dutiable at 22½ per centum ad valorem, as claimed.

The sole witness was a partner in the plaintiff company, whose experience with Sumakh rugs extended over a period of "15 to 18 years." Sumakh rugs are produced "by a tribe of Armenians in the region of Sumakha." They are woven by hand with a needle by which "the stitch goes over four warps and comes back and under, takes in two warps and then comes over again and goes over four warps and comes back and covers two warps. It gives the effect of a sort of a diagonal weave when it is examined like this and slightly shiny. On the back you have the loose ends of the piling hanging loose." Between the weaving, there is a filler, either cotton or wool, so that when the rug is opened "you see four warps through the stitch, and that is the Sumakh rug, and no other rug that I know of is made that way." (R. 19.) The Sumakh is an oriental rug. It is bought and sold as such and so recognized by legitimate rug dealers.

The witness' opinion, that Sumakh rugs are oriental rugs, finds support in Webster's New International Dictionary which recognizes such class of rugs in the definition of "Oriental rug *or* carpet," reading as follows:

Any hand-woven or hand-knotted one-piece rug or carpet made in the Orient, esp. in Asia. With the exception of kilims *and Sumaks*, Oriental carpets and rugs have a pile produced by knotting around one or, generally, two warps of cotton or

wool, one or several tufts of colored woolen or silk (or in a few instances, cotton) yarn, over each row of which a woof shot is passed. The texture, workmanship, and esp., the designs, vary with the locality in which the rugs are produced and with the mode of living and traditions of the weavers. [Italics supplied.]

The protest is sustained and judgment will be rendered accordingly.